# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:18CR9-2

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **DENISE ANN SMITH,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| ——————————————— | ) | |

This matter is before the Court on Defendant's Motion to Suppress (# 23) and Memorandum in Support. The Government filed a Response (# 26). On April 24, 2018, the undersigned conducted a hearing and heard evidence from the Government and Defendant. Post-hearing, Defendant filed a Brief In Support Of Motion To Suppress (# 38), and the Government filed a Supplemental Response To Defendant's Brief (# 40). Having carefully considered the evidence and arguments of counsel, the Court enters the following Findings, Conclusions, and Recommendation.

## FINDINGS AND CONCLUSIONS

### I.    Procedural Background

Defendant is charged in one count of an eight-count Bill of Indictment (# 1). In particular, Defendant is charged in Count One with making a false and fictitious written statement to American Tactical and Pawn, a licensed dealer of firearms, in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6) and 18 U.S.C. § 924(a)(2).

On March 21, 2018, Defendant filed her Motion to Suppress (# 23), in which she moves to suppress all physical evidence seized as the result of the March 13, 2017 search

of her home and all statements made by her and her son, Michael Smith, to law enforcement officers during the search.[1]  On March 28, 2018, the Government filed its Response to Defendant's Motion (# 26).

On April 24, 2018, the Court held a hearing on Defendant's Motion.  At the end of the hearing, Defendant's counsel made an oral motion for leave to file an additional brief.  On April 25, 2018, the oral motion was granted by written order (# 36).

On May 6, 2018, Defendant filed a "Brief In Support Of Motion To Suppress" (# 38).  On May 11, 2018, the Government filed a "Supplemental Response To Defendant's Brief" (# 40).

## II.    Factual Background

### A.    John McIntyre

John McIntyre ("Officer McIntyre") was called as a witness for the Government. (Apr. 24, 2018 Hr'g Tr. at 36-103.)  Officer McIntyre has been employed for twenty years as a law enforcement officer with the Cleveland County Sheriff's Office. (Apr. 24, 2018 Hr'g Tr. at 37.)   In February 2017, Officer McIntyre was a lieutenant over the Investigations Division. (Apr. 24, 2018 Hr'g Tr. at 37.)

In early 2017, Officer McIntyre received a Crime Stoppers tip, which stated that Brandon Randall, who lived at Towery Road in Shelby, North Carolina, was dealing drugs and firearms. (Apr. 24, 2018 Hr'g Tr. at 38.)  On February 22, 2017, Officers with the Cleveland County Sheriff's Office began surveillance on the Towery Road home.  (Apr.

_____

[1] Michael Smith will be referred to by his first and last name throughout this Memorandum and Recommendation to avoid any confusion with his mother, Defendant Denise Ann Smith.

24, 2018 Hr'g Tr. at 39, 45.)

While watching Randall's home, Officer McIntyre noticed a vehicle go into the driveway of the home, stay a short period of time, and leave. (Apr. 24, 2018 Hr'g Tr. at 39.) Based upon Officer McIntyre's experience, he suspected drug activity and decided to follow the vehicle. (Apr. 24, 2018 Hr'g Tr. at 39-40.) A check of the vehicle's registration tag showed the tag was registered to a Chevrolet vehicle that had been placed on a Dodge vehicle. (Apr. 24, 2018 Hr'g Tr. at 40.) Based on this observation, Officer McIntyre stopped the vehicle. (Apr. 24, 2018 Hr'g Tr. at 40.)

Officer McIntyre discovered a "Mr. Queen" was operating the vehicle, and Queen's driver's license had been revoked. (Apr. 24, 2018 Hr'g Tr. at 40.) Queen told Officer McIntyre that he had gone to the Randall residence on Towery Road to purchase marijuana, but Randall was not at home. (Apr. 24, 2018 Hr'g Tr. at 40.) Queen informed Officer McIntyre that Queen was now on his way to another location where Randall sold marijuana, which was 216 Dellinger Road, Shelby, North Carolina. (Apr. 24, 2018 Hr'g Tr. at 41.) Queen also stated that Randall was known to deal drugs out of both locations. (Apr. 24, 2018 Hr'g Tr. at 41.)

Officer McIntyre released Queen and traveled to 216 Dellinger Road, Shelby, North Carolina to determine if Randall was present at that residence. (Apr. 24, 2018 Hr'g Tr. at 41.) At the residence, Officer McIntyre saw a green Nissan vehicle that was owned by Defendant. (Apr. 24, 2018 Hr'g Tr. at 42.) A black Impala vehicle then arrived, stayed a few minutes, and left, which was consistent with a drug transaction. (Apr. 24, 2018 Hr'g Tr. at 42.)

Officer McIntyre followed the Impala and saw the driver almost hit another vehicle near an Arby's restaurant. (Apr. 24, 2018 Hr'g Tr. at 42.) Officer McIntyre proceeded to stop the Impala and talked to the driver. (Apr. 24, 2018 Hr'g Tr. at 43.) The driver seemed very nervous. (Apr. 24, 2018 Hr'g Tr. at 43.)

When the driver stepped out of the vehicle, Officer McIntyre noticed a cellophane baggie in the door handle, which was consistent with the type bag used to store drugs. (Apr. 24, 2018 Hr'g Tr. at 44.) The driver stated that there was Xanax in the bag, and he did not have a prescription for the Xanax. (Apr. 24, 2018 Hr'g Tr. at 44.) The driver also stated that his female passenger had non-tax paid white liquor in her possession. (Apr. 24, 2018 Hr'g Tr. at 44.) Both the driver and the passenger stated they had bought the Xanax and the non-tax paid white liquor from Randall at the residence on 216 Dellinger Road. (Apr. 24, 2018 Hr'g Tr. at 44.) The Xanax and non-tax paid white liquor were seized by Officer McIntyre. (Apr. 24, 2018 Hr'g Tr. at 44-45.)

The driver and the female passenger agreed to serve as confidential informants for Officer McIntyre. (Apr. 24, 2018 Hr'g Tr. at 44-45.) The driver made a monitored call to Randall and asked to return to the 216 Dellinger Road home to purchase marijuana. (Apr. 24, 2018 Hr'g Tr. at 45.) The driver, the female passenger, and the Impala were searched by officers. (Apr. 24, 2018 Hr'g Tr. at 46) They were given audio and video recording equipment, and the driver and female passenger traveled back to the 216 Dellinger Road. (Apr. 24, 2018 Hr'g Tr. at 46.)

The driver and female passenger went inside the home and used sixty dollars in currency provided by Officer McIntyre to purchase marijuana from Randall. (Apr. 24, 2018

4

Hr'g Tr. at 47.) The driver and female passenger then left the 216 Dellinger Road residence and met with Officer McIntyre and delivered the marijuana to him. (Apr. 24, 2018 Hr'g Tr. at 47-48) The driver stated he bought the marijuana from Randall and that Michael Smith, Defendant's son, was present during the purchase. (Apr. 24, 2018 Hr'g Tr. at 47-48.) The driver further stated that he saw more marijuana, Ecstasy pills, and white non-tax paid liquor in the home. (Apr. 24, 2018 Hr'g Tr. at 49.)

On February 27, 2017, Officer McIntyre, through the driver of the Impala who was an informant, attempted to contact Randall to purchase more illegal substances. (Apr. 24, 2018 at 49-50.) The plan was for the informant and an undercover investigator, Travis Glover, to travel to the residence at 216 Dellinger Road and purchase illegal substances. (Apr. 24, 2018 Hr'g Tr. at 50.) The informant and Officer Glover were provided with audio and video recording equipment and United States currency to make the purchase. (Apr. 24, 2018 Hr'g Tr. at 50-51.)

Upon arrival at the home, the informant and Officer Glover went inside and had a conversation with Michael Smith. (Apr. 24, 2018 Hr'g Tr. at 51.) Michael Smith stated that Randall was not there. (Apr. 24, 2018 Hr'g Tr. at 51.) Michael Smith was asked to contact Randall to see if the purchase of illegal substances could be made from Randall. (Apr. 24, 2018 Hr'g Tr. at 52.) Officer McIntyre could hear the conversation from the audio recording equipment. (Apr. 24, 2018 Hr'g Tr. at 52.) Michael Smith called Randall on the telephone and told him the informant and the undercover investigator wanted to purchase all the Ecstasy that Randall had. (Apr. 24, 2018 at 52.) Both the informant and the undercover investigator showed Michael Smith the currency, and Michael Smith

5

verified to Randall that the potential purchasers had the cash necessary to buy the controlled substances. (Apr. 24, 2018 Hr'g Tr. at 53.) During the conversation, the informant and the investigator commented that the marijuana they were seeing at Michael Smith's home was "not any good." Michael Smith spoke into the phone and told Randall, "That is your marijuana they are talking about." (Apr. 24, 2018 Hr'g Tr. at 53.)

The undercover investigator and the informant then traveled to the home of Randall located at Towery Road. (April 24, 2018 Hr'g Tr. at 53.) Randall came out to the vehicle and sold Ecstasy pills, Hydrocodone pills, and Xanax to the undercover investigator and the informant. (Apr. 24, 2018 Hr'g Tr. at 54.) Randall also brought out a MAC-10 firearm and a pistol with him. (Apr. 24, 2018 Hr'g Tr. at 54.) Randall is a convicted felon. (Apr. 24, 2018 Hr'g Tr. at 54-55.) On March 9 and 10, 2017, undercover investigator Glover purchased additional controlled substances and a .45 caliber firearm from Randall. See Gov. Ex. 4. (Apr. 24, 2018 Hr'g Tr. at 56.)

On March 10, 2017, undercover investigator Glover made arrangements to purchase Ecstasy pills from Randall. (Apr. 24, 2018 Hr'g Tr. at 57.) During the purchase, Randall was arrested. (Apr. 24, 2018 Hr'g Tr. at 57.) Randall told Officer McIntyre that he wished to speak to the officers, and Randall was taken to Officer McIntyre's office. (Apr. 24, 2018 Hr'g Tr. at 57.) Officer Gordan went to search Randall's home on Towery Road. (Apr. 24, 2018 Hr'g Tr. at 57.)

After a search of the home at Towery Road, Officer McIntyre made an inventory of the items seized, which included cash that had been hidden in the home containing serial numbers consistent with the cash that had been used to make the purchases of the controlled

substances from Randall. (Apr. 24, 2018 Hr'g Tr. at 58-59.) Officer McIntyre was also advised that the officers had found a Smith & Wesson AR-15 assault-style rifle. (Apr. 24, 2018 Hr'g Tr. at 59.) The officers also found a purchase order or receipt for that specific firearm showing that the purchaser of the firearm was Denise Ferrer Smith, Defendant. See Gov. Ex. 9. (Apr. 24, 2018 Hr'g Tr. at 59, 76.)

On March 10, 2018, Officer McIntyre listened to a recorded call made by Randall from the Cleveland County Jail. (Apr. 24, 2018 Hr'g Tr. at 60.) In the call to Randall's mother, Randall stated he "wanted his 'AR' back." (Apr. 24, 2018 Hr'g Tr. at 61.) On March 13, 2017, Officer McIntyre heard Randall ask his father to go to Mike Smith's house and collect Randall's money. (Apr. 24, 2018 Hr'g Tr. at 61.)

Officer McIntyre testified that he decided there was probable cause to believe that there might be evidence of criminal activity located at 216 Dellinger Road based upon the following: (1) the purchase of drugs and illegal non-tax paid liquor located at the residence; (2) the fact that Randall might have stored firearms at the residence; and (3) Defendant was named as the purchaser of the AR-15 assault rifle. (Apr. 24, 2018 Hr'g Tr. at 62.) Officer McIntyre prepared and obtained a search warrant for the search of the residence at 216 Dellinger Road at 3:15 p.m. and executed the search warrant at 3:39 p.m. on March 13, 2018. See Gov. Ex. 4. (Apr. 24, 2018 Hr'g Tr. at 62-63.)

When serving the search warrant, Officer McIntyre, Officer Gordan, Officer Glover, and three uniformed officers went to the home located at 216 Dellinger Road to execute the search warrant. (Apr. 24, 2018 Hr'g Tr. at 63-64.) Present at the home was Defendant; Defendant's husband; Defendant's son, Michael Smith; and another lady. (Apr. 24, 2018

7

Hr'g Tr. at 64.) Officer McIntyre asked Michael Smith if he would talk to him. (Apr. 24, 2018 Hr'g Tr. at 65.) Michael Smith and Officer McIntyre then walked outside of the home and sat in Officer McIntyre's minivan, which was parked in the driveway of the residence. (Apr. 24, 2018 Hr'g Tr. at 66.)

Officer McIntyre recorded the interview with Michael Smith on his cell phone. See Gov.'s Ex. 2. (Apr. 24, 2018 Hr'g Tr. at 66.) Michael Smith was not under arrest, and he was advised he was free to go. (Apr. 24, 2018 Hr'g Tr. at 68.) Officer McIntyre did not make threats or promises to Michael Smith. (Apr. 24, 2018 Hr'g Tr. at 67.)

During the interview, Michael Smith told Officer McIntyre that he had known Randall for a little over a year. Michael Smith met Randall at the home of a neighbor to whom Randall was selling drugs. Michael Smith stated that he would purchase fifty dollars of marijuana from Randall each week. This had occurred over a two or three-month period before March 13, 2017. Randall began to use Defendant's home at 216 Dellinger Road to sell drugs. Randall would come to the home each day, and at least three people per day would come to the residence to purchase drugs from Randall. See Gov. Ex. 2.

When questioned about Randall's possession of guns, Michael Smith stated Randall had possessed a MAC-10 weapon, but he had sold it to an informant. Michael Smith stated Randall wanted him to purchase firearms and sell them to persons from Florida, where Randall obtained the controlled substances he sold. Randall then asked Michael Smith to purchase an AR-15 assault rifle for Randall. Michael Smith knew that Randall was a convicted felon and could not lawfully purchase a firearm. Michael Smith told Randall he would ask his mother, Defendant, to purchase the firearm for Randall. Michael Smith then

8

lied to his mother and asked her to purchase the firearm for Michael Smith and did not ask her to purchase it for Randall.

Michael Smith stated that Defendant agreed to purchase the firearm for Michael Smith, but only if the firearm was secured at Randall's residence by Randall's father. According to Michael Smith, Defendant talked to Randall's father, who agreed to keep the firearm inside of Randall's father's gun safe. At the Smith home, Randall gave Defendant $900.00 to purchase the firearm. Randall, Michael Smith, and Defendant then went together to purchase the firearm, which was selected by Randall, a Smith & Wesson AR-15 assault rifle. After the purchase of the weapon, Defendant carried the firearm out of the store. The rifle was then taken by Randall to his father's home. When questioned about his possession of money owned by Randall, Michael Smith stated Randall had brought him $1,300.00 in currency and some drugs to hold while Randall went with his girlfriend to visit some of her friends.

Later that same day, Randall came back to Defendant's home and took back the money and drugs. Michael Smith was then asked by Officer McIntyre and Officer Gordan if Michael Smith would ask his mother, Defendant, if she would speak to the officers. Michael Smith left the minivan and went to get his mother. See Gov. Ex. 2. (Apr. 24, 2018 Hr'g Tr. at 68-92.)

Defendant came to the minivan to meet with the officers. (Apr. 24, 2018 Hr'g Tr. at 69, 92.) A recording of Defendant's interview was introduced into evidence. See Gov.'s Ex. 1. In the recording, Officer McIntyre can be heard telling Defendant that she was not under arrest, and the officers were performing an investigation about drugs and guns.

9

Officer McIntyre told Defendant, "We would like to speak with you." Defendant responded, "I have no problem." Defendant was then asked about her knowledge of Randall selling drugs. Defendant stated that she had seen him with a bag of Xanax pills and a big bag of marijuana. Randall had told Defendant that he obtained drugs from a friend and sold them.

With respect to firearms, Defendant stated she obtained a gun for Randall about a month ago. Defendant stated that she was asked to purchase the gun for Randall because she could buy the firearm legally. Defendant stated Randall could not purchase a firearm because he had been in jail. Defendant knew Randall was on probation because she had taken him to visit his probation officer on two occasions. Randall went with Defendant, and he picked out the firearm he wanted purchased. Randall stated to Defendant that he knew the people at the pawn shop where the firearm was purchased. Defendant did not know the name, type, or caliber of the firearm that was purchased. When the interview was complete, Defendant was thanked by the officers, and she replied that the officers were very welcome and requested the officers provide her a card, so she could contact them if she thought of something else. See Gov.'s. Ex 1. Defendant was then allowed to leave, and she was not arrested. (Apr. 24, 2018 Hr'g Tr. at 71.) During the interview, no threats were made to Defendant, and she seemed sober, awake, and willing to talk to the officers. (Apr. 24, 2018 Hr'g Tr. at 70.)

The search of 216 Dellinger Road took a little over an hour. (Apr. 24, 2018 Hr'g Tr. at 71, 88.) The officers found non-tax paid white liquor and some marijuana and paraphernalia. (Apr. 24, 2018 Hr'g Tr. at 71, 88.)

10

On March 15, 2017, Randall gave a statement to officers concerning the purchase of the firearm. (April 24, 2018 Hr'g Tr. at 79-80) Randall stated he approached Michael Smith about buying the firearm for Randall and Michael Smith did not have sufficient identification to do so. (April 24, 2018 Hr'g Tr. at 79.)  Michael Smith and Randall then approached Defendant about purchasing the firearm since neither of them could do so legally. (Apr. 24, 2018 Hr'g Tr. at 79.)

Randall supplied the money for the purchase. (Apr. 24, 2018 Hr'g Tr. at 95.)  Randall stated that he, Michael Smith, and Defendant had first gone to Diamond Pawn Shop to purchase the firearm, but they were told to leave after the manager heard Randall speaking about the firearm as if it was going to be purchased for him. (Apr. 24, 2018 Hr'g Tr. at 100-01.)  Randall, Michael Smith, and Defendant then went to American Tactical and Pawn, where they successfully purchased the firearm. (Apr. 24, 2018 Hr'g Tr. at 99.)

**B.  Bryon Gordan.**

Since 1998, Bryon Gordan has been employed as a Deputy Sheriff with the Cleveland County Sheriff's Office.  (Apr. 24, 2018 Hr'g Tr. at 104.)  In February and March of 2017, Officer Gordan was a lieutenant assigned to the narcotics unit.  (April 24, 2018 Hr'g Tr. at 105.)  On March 10, 2017, Officer Gordan took five or six officers to the home of Randall, which is located at Towery Road, to conduct a search of the residence pursuant to a search warrant that had been issued. (Apr. 24, 2018 Hr'g Tr. at 105-06.)

On March 10, 2017, Randall was in the custody of the Sheriff's Department, and no one else was at the home. (Apr. 24, 2018 Hr'g Tr. at 106.)  During the search of the dwelling, Officer Gordan called Randall's father at work and requested that he come to the

11

home to open a gun safe that had been discovered. (Apr. 24, 2018 Hr'g Tr. at 107.)

Upon opening the gun safe, Officer Gordan discovered a Smith & Wesson M&P AR-15 rifle. (Apr. 24, 2018 Hr'g Tr. at 110-11)  The rifle was seized, along with a cardboard box for the rifle. (Apr. 24, 2018 Hr'g Tr. at 111-12)  Located inside the box was a pink colored receipt for the purchase of the firearm, which had the same serial number as that of that firearm. See Gov.'s Ex. 9.  (Apr. 24, 2018 Hr'g Tr. at 112-13.)  The receipt showed that both the firearm and ammunition for the firearm were purchased at American Tactical and Pawn in Shelby, North Carolina on February 17, 2017, by Denise Ferrer Smith, whose address was listed as 1140 Poplar Springs Church Road, Shelby, North Carolina.  (April 24, 2018 Hr'g Tr. at 113-14, 131-32.)

At the time of the search of the Randall residence, Officer Gordan was aware that Randall was a convicted felon. (April 24, 2018 Hr'g Tr. at 115.)  During the search of the house and gun safe, Randall's father was present and told Officer Gordan the AR-15 rifle found in the gun safe belonged to Brandon Randall. (Apr. 24, 2018 Hr'g Tr. at 115.)

Officer Gordan was present for the search of Defendant's home as an on-scene supervisor. (Apr. 24, 2018 Hr'g Tr. at 117.)  Officer Gordan talked to Michael Smith, and Michael Smith provided the officers with a small amount of non-tax paid alcohol and some drug paraphernalia from a bedroom. (Apr. 24, 2018 Hr'g Tr. at 118.)

Officer Gordan was present during a portion of the interview by Officer McIntyre of Michael Smith, and Officer Gordan was present for the entire interview by Officer McIntyre of Defendant.  (Apr. 24, 2018 Hr'g Tr. at 118, 128-30.)  No threats or promises were made to Defendant or Michael Smith, and both individuals were very cooperative.

(Apr. 24, 2018 Hr'g Tr. at119.) After his interview, Michael Smith went into the house to see if Defendant would come out to the officers' van to be interviewed. (Apr. 24, 2018 Hr'g Tr. at 129.)

### C. Travis Glover.

Travis Glover was called as a witness for the Government. (Apr. 24, 2018 Hr'g Tr. at 7-36.) Officer Glover works as an undercover law enforcement officer for the Cleveland County Sheriff's Office. (Apr. 24, 2018 Hr'g Tr. at 7-8.) Officer Glover has been a law enforcement officer for ten (10) years. (April 24, 2018 Hr'g Tr. at 8.) In February 2017, Officer Glover became involved in an investigation of Brandon Randall. (Apr. 24, 2018 Hr'g Tr. at 8.)

Officer Glover testified that an informant made a telephone call to Randall and Michael Smith to arrange the purchase of narcotics from Randall at the home of Michael Smith located at 216 Dellinger Road, Shelby, North Carolina. (Apr. 24, 2018 Hr'g Tr. at 10-11) Officer Glover then went with the informant to the home of Michael Smith at 216 Dellinger Road, Shelby, North Carolina to purchase narcotics from Randall. (April 24, 2018 Hr'g Tr. at 9-10.) Upon arrival at Smith's home, Officer Glover and the informant went into the bedroom of Michael Smith, which is located inside the Smith home. (Apr. 24, 2018 Hr'g Tr. at 12.) Michael Smith had only a small amount of marijuana. Michael Smith then called Randall to "line-up" a narcotics deal whereby Officer Glover and his informant would purchase Xanax pills from Randall. (April 24, 2018 Hr'g Tr. at 13.) After the call, Michael Smith told Officer Glover and the informant to go to Towery Road to meet with Randall at his home. (April 24, 2018 Hr'g Tr. at 13-14.) At Randall's residence,

13

Officer Glover bought Ecstasy, Hydrocodone, and Xanax pills from Randall. (Apr. 24, 2018 Hr'g Tr. at 14.) Officer Glover also noticed that Randall had a revolver in his waistband. (April 24, 2018 Hr'g Tr. at 14.) At the time, the informant bought Xanax pills from Randall. (April 24, 2018 Hr'g Tr. at 15.)

Officer Glover testified that he purchased a firearm and some Ecstasy pills from Randall on March 9, 2017. (Apr. 24, 2018 Hr'g Tr. at 16.) A few days later, Officer Glover arrested Randall during a drug purchase. (Apr. 24, 2018 Hr'g Tr. at 16-17.)

Officer Glover testified that during a search of Randall's home, Officer Glover called Randall's father, Scott Randall,[2] to request that Scott Randall come to the home and open a gun safe. (Apr. 24, 2018 Hr'g Tr. at 22-23.) Inside the gun safe, Officer Glover saw an AR-15 rifle and found a receipt for the purchase of the rifle which showed that the rifle was purchased by Defendant. (Apr. 24, 2018 Hr'g Tr. at 20-22.) Scott Randall told Officer Glover that Denise Smith had purchased the rifle for Brandon Randall. (Apr. 24, 2018 Hr'g Tr. at 22-23.)

### D. Government's Exhibits.

During the hearing, the Government offered and introduced into evidence the following exhibits:

(1) CD recording of interview of Defendant;

(2) CD recording of interview of Michael Smith;

(3) CD recording of interview of Michael Smith;

---

[2] Scott Randall will be referred to by his first and last name throughout this Memorandum and Recommendation to avoid confusion with his son, Brandon Randall.

14

(4)     Search Warrant for 216 Dellinger Road;

(5)     Photograph of Randall dwelling house;

(6)     Photograph of gun safe located in bedroom of Brandon Randall's father before gun safe was opened;

(7)     Photograph of the inside of the gun safe located in bedroom of Brandon Randall's father after the safe was opened;

(8)     Photograph of Smith & Wesson M&P AR-15 rifle taken from the gun safe;

(9)     Copy of a receipt dated February 17, 2017, for the purchase of a Smith & Wesson M&P rifle from American Tactical and Pawn, Inc. by "Denise Ferrer Smith."

## III.   ANALYSIS

### A.     The Search Warrant

#### 1.     Legal standard applicable to a motion to suppress a search warrant

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "This fundamental right is preserved by a requirement that searches be conducted pursuant to a search warrant issued by an independent judicial officer." California v. Carney, 471 U.S. 386, 390 (1985).

When a district court reviews a search warrant issued by a magistrate or a superior court judge, the judicial officer's determination of probable cause is entitled to great deference. United States v. Wellman, 663 F.3d 224, 228 (4th Cir. 2011); United States v. Hodge, 354 F.3d 304, 309 (4th Cir. 2004). "Thus, 'the duty of a reviewing court is simply

15

to ensure that the magistrate had a substantial basis for concluding that probable cause existed.'" Hodge, 354 F.3d at 209 (quoting Illinois v. Gates, 462 U.S. 213, 238-39 (1983)). Moreover, the Court must limit its review to considering "only the information presented to the magistrate who issued the warrant." United States v. Wilhelm, 80 F.3d 116, 118 (4th Cir. 1996).

In Hodge, the United States Court of Appeals for the Fourth Circuit explained the concept of probable cause necessary for the issuance of a search warrant:

> As the Supreme Court has noted, "probable cause is a fluid concept— turning on the assessment of probabilities in particular factual contexts---not readily, or even usefully, reduced to a neat set of legal rules." Id. at 232, 103 S. Ct. 2317. Although noting that probable cause is not susceptible to precise definition, the Supreme Court has described it as "existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L.Ed.2d 911 (1996); see also Gates, 462 U.S. at 238, 103 S. Ct. 2317 ( explaining that a probable cause inquiry involves a determination of "whether, given all the circumstances…, there is a fair probability that contraband or evidence of a crime will be found in a particular place").

354 F.3d at 309; see also Wellman, 663 F.3d at 228 ("the relevant question is whether the known facts and circumstances were sufficient such that a person of reasonable prudence could conclude that the described evidence would be found in that particular place."). As the Fourth Circuit and Supreme Court have explained, there is no bright-rule as to what specific information a search warrant application must include, and officers may decide to include a variety of information when submitting an application to a magistrate. See Wellman, 663 F.3d at 228. Instead, the Court must review the application in its entirety and determine whether it provided sufficient information to support the issuance of the

search warrant in question.  Id.

The portion of the sworn application for the search warrant for 216 Dellinger Road, Shelby, North Carolina, which the Government contends provides probable cause for the issuance of the search warrant, reads as follows:

On February 22, 2017 Investigators with the Cleveland County Sheriff's Office supplied a confidential informant with $60.00 from the Cleveland County Sheriff's Office special funds account to purchase Marijuana from Brandon Patrick Randall.  The confidential informant purchased marijuana from Mr. Randall for $60.00 while at the residence of 216 Dellinger Rd.  The Confidential Informant was searched before and after the transaction with nothing being found.  He was also under surveillance during and after the transaction.  The Confidential Informant also witnessed gallons of non-tax paid white liquor, marijuana and Xanax's at this residence.  Michael Smith AKA "Twitch" was also present during this transaction.

On February 27, 2017 an undercover Investigator with the Cleveland County Sheriff's Office went to the location of 3617 Towery Rd. and was supplied with $600.00 from the Cleveland County Sheriff's Office special funds account to purchase Ecstasy from Brandon Patrick Randall.  During the transaction Mr. Randall had to return to inside this residence to get more Ecstasy.  The undercover Investigator did see an unknown firearm in Mr. Randall's front pocket.  When Mr. Randall returned to the vehicle with the Undercover Investigator Mr. Randall brought a semi-automatic "Mac10".  The firearm was loaded with one in the chamber.  Mr. Randall did allow the undercover investigator to hold the firearm and the investigator was able to identify the firearm as authentic.  The undercover Investigator was able to purchase 50 Ecstasy pills, 4 hydrocodone pills, and 2 Xanax pills.

On 3-9-2017 the undercover Investigator was able to contact Brandon Patrick Randall by telephone.  During the conversation Mr. Randall agreed to sell the undercover investigator 100 Ecstasy pills and the "Mac10" semi-auto firearm for $1900.00.  Mr. Randall also during this conversation stated that our confidential informant was a "Fed" and that he wasn't going back to Prison.  Brandon Patrick Randall is a convicted felon as of 01/30/2017.  Undercover Investigator was supplied with $3000.00 to purchase the 100 Ecstasy pills and the "Mac10" semi-auto firearm and any other firearms that Mr. Randall may have available for sale.

On 3-9-2017 the undercover investigator went to 3617 Towery Rd Shelby, NC

17

and made a purchase from Brandon Patrick Randall. The undercover investigator purchased a Masterpiece Arms .45 caliber firearm which as reported stolen to Gastonia Police and

On 3-10-17 the Undercover investigator was purchasing 100 or more Ecstasy when Cleveland County Sheriff's Office conducted an arrest takedown of Brandon Patrick Randall on Fernwood Dr. During the arrest Brandon was found to be in possession of Ecstasy, Xanax, marijuana, and LSD. A search warrant issued by Judge Bridges was also served at 3617 Towery Rd. As a result of the search more controlled substance and a AR15 rifle was found. Documentation was located with the rifle showing where Denise Smith had purchased the rifle.

On 3-13-17 Sgt. J. McIntyre was listening to the jail phone calls of Brandon Patrick Randall. Sgt. J. McIntyre is familiar with Mr. Randall's voice from previous controlled purchases and interviews. During this phone conversation Mr. Randall was trying to get the male subject he was talking with to go to "Twitch's" residence and get $1310.00. On 2-22-17 a controlled purchase of marijuana was made at "Twitch's" residence which was identified through surveillance as 216 Dellinger Rd. Shelby NC. Also a controlled purchase was attempted on 2-27-17 at this location but "Twitch" directed our confidential informant and the undercover investigator to Towery Rd Where he met with Brandon Randall and completed the deal. During debrief, the confidential informant, identified "Twitch" as Michael Smith. During both of these dates a vehicle registered to Denise Ferrer Smith was located at the residence of 216 Dellinger Rd. Shelby NC.

This applicant requests that a search warrant to be issued for the address of 216 Dellinger Rd. Based on the previous purchases and searches it is reasonable to believe that since Mr. Randall is storing US currency at this location, "Twitch" AKA Michael Smith and Mr. Randall are in a conspiracy to sell marijuana, and possibly store controlled substances, and firearms.

In the instant case, the facts and information contained in the application for a search warrant for 216 Dellinger Road was sufficient to support the issuance of the search warrant. The application shows that on February 22, 2017, a confidential informant bought marijuana from Randall at the residence at 216 Dellinger Road. The purchase was made by the confidential informant while being surveilled. While inside the home, the informant

saw gallons of non-tax paid white liquor, marijuana, and Xanax pills. Michael Smith was a resident of the home, and he was present in the home during the transaction.

On February 27, 2017, a purchase of controlled substances was attempted at the residence at 216 Dellinger Road, but Michael Smith directed the informant and the officer who were making the purchase to the residence of Randall at Towery Road. On February 27, 2017, and again on March 9, 2017, either controlled substances or firearms, or both, were purchased from Randall at the Towery Road residence. On March 10, 2017, a search warrant was issued by a State Judge, and a search was made of the Towery Road residence, where controlled substances and an AR-15 rifle were found with documentation that showed Defendant had purchased the rifle. Randall was a convicted felon as of January 30, 2017. On March 13, 2017, a jail call was recorded from Randall asking a male subject to go to Michael Smith's residence to get $1,300.00. Finally, on both February 22 and February 27, 2017, a vehicle registered to Defendant was located at the 216 Dellinger Road residence.

The affidavit details the history of the investigation and offers specific facts showing that controlled substances had been sold in the residence and other illegal substances were seen in the residence. The affidavit further shows probable cause to believe that controlled substances and currency from the sale of such substances might be found at the 216 Dellinger Road residence. See Wellman, 663 F.3d at 228.

This is all that is required. Defendant seeks to invalidate the search warrant by focusing on the issue that the application does not contain sufficient evidence to show evidence of a conspiracy to sell drugs existed between Michael Smith and Randall. This

19

argument ignores the totality of the information in the application, which shows: (1) a sale of controlled substances was made in the home; (2) un-tax paid white liquor and other controlled substances were seen in the home; (3) the discovery of the AR-15 rifle in Randall's home, which was titled in Defendant's name; and (4) repeated purchases of drugs and firearms were made from Randall, a convicted felon. The recorded telephone call provided reason to believe that proceeds from the sale of drugs or firearms might be located at the 216 Dellinger Road residence.

The question is whether the application, in its entirety, provides sufficient information to support the issuance of a search warrant authorizing the search of the residence at 216 Dellinger Road. When considered in its entirety and recognizing the deference which must be shown to the State magistrate's determination, Hodge, 354 F.3d at 309, the Court finds that the known facts and circumstances were more than sufficient to allow a person of reasonable prudence to conclude that the residence at 216 Dellinger Road would contain controlled substances, non-tax paid liquor, proceeds of drug transactions, or even illegal firearms. See Wellman, 663 F.3d 228.

### B.   Defendant's Statements

Defendant argues that her recorded statements to Officer McIntyre should be suppressed as a fruit of unlawful police action and cites the case of Wong Sun v. United States, 371 U.S. 471 (1963). The facts in Wong Sun are completely different than those presented in the case herein. The search of the residence at 216 Dellinger Road was made pursuant to a validly issued search warrant and the encounter with and interview of Defendant was voluntary. A reading of Wong Sun shows that this case has no applicability

20

to the facts presented in the instant case. In Wong Sun there was an illegal and warrantless entry into the defendant's home and immediate arrest of several persons in the home. Thus, Wong Sun has no applicability here.

Despite the issues not being raised by Defendant, and to assist the presiding District Judge, the undersigned will address two (2) issues that could have been presented and do appear to be applicable herein:

> (1) **Was Defendant subject to a custodial interrogation and thus entitled to be warned of her rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966);**
>
> (2) **Were the statements of Defendant a product of coercive police activity, and thus, not voluntary within the Due Process Clause of the Fourteenth Amendment?**

(1) In United States v. Jamison, 509 F.3d 623 (4th Cir. 2007), the Fourth Circuit explained:

> The Fifth Amendment commands that "[n]o person…shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege against self-incrimination is not limited to statements made during criminal court proceedings; rather, it attaches whenever a person is in custody and subject to interrogation. Miranda v. Arizona, 384 U.S. 436, 467, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation "means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444, 86 S. Ct. 1602. Thus, during the course of a criminal trial, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

Id. 628.

There is no question that Defendant was not advised of her Miranda rights when she was questioned. Accordingly, the issue for the Court is whether Defendant was in custody

at the time and subject to a custodian interrogation. If not, then no Miranda warning was required. United States v. Parker, 262 F.3d 415, 419 (4th Cir. 2001).

The Fourth Circuit set forth the standard for determining when a defendant is in custody in United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007). In Colonna, the Fourth Circuit stated that:

> An individual is in custody "when, under the totality of the circumstances, 'a suspect's freedom from action is curtailed to a 'degree associated with formal arrest.'" Id. (quoting Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L.Ed.2d 317 (1984)). The operative question is whether, viewed objectively, "a reasonable man in the suspect's position would have understood situation" to be one of custody. Berkemer, 468 U.S. at 422, 104 S. Ct. 3138.

Colonna, 511 F.3d at 435. The issue of custody typically turns on whether a reasonable person in the defendant's position would have felt that he or she was not at liberty to end the interrogation and leave. Jamison, 509 F.3d at 628. "Custody determinations do not depend on the subjective views of either the interrogating law enforcement officers or of the person being questioned, but depend instead the objective circumstances of the interrogation." Parker, 262 F.3d at 419.

Two cases decided by the Fourth Circuit Court of Appeals are instructive in determining the issue in the instant. In Parker, the defendant was observed making a purchase from a gun shop. 262 F.3d at 417. Agents then witnessed defendant transfer to her brother the merchandise for cash. Id. When officers stopped defendant's brother, he resisted and was shot. Id. The next morning at 5:30 a.m., six or seven ATF Agents went to the defendant's home to question defendant. Id. After the defendant was awakened, two agents escorted defendant to a bedroom where she was questioned for thirty minutes.

Id.  The door to the bedroom was closed or nearly closed.  Id.  One agent sat in a chair and at least one other agent stood against the wall of a 9' x 11' room while the defendant sat on the bed.  Id.  The defendant was not handcuffed, and at some point she was informed she was not under arrest.  Id.  The Defendant was not given a Miranda warning.  Id.  One of the officers testified that had the defendant attempted to leave the room she would have been allowed to do so but she would not have been allowed to leave the house.  Id.  Eventually, an agent wrote a statement in which she confessed to having provided ammunition to a convicted felon.  Id.  The defendant reviewed and signed the statement. Id.

The defendant moved to suppress the statements on the ground that she was in custody for Miranda purposes, and because she was not given a Miranda warning, her statements should be suppressed.  The district court denied the motion, finding that the defendant was not in custody at the time.  Id. at 419.  The Court of Appeals affirmed the district court's ruling, finding that under the objective circumstances of the interrogation a reasonable person in the defendant's position would have had the opinion they were free to end the questioning and leave.  Id.

In United States v. Hargrove, 625 F.3d 170 (4th Cir. 2010), ten or fifteen law enforcement officers executed a search warrant on the defendant's home at 6:00 a.m.  The defendant was told he was not under arrest and was free to leave at any time.  Id. at 173-174.  The defendant then agreed to speak to the officers in defendant's kitchen.  Id. at 174. The defendant was not in handcuffs and was dressed in pajamas.  Id.  During the questioning, two agents sat at the kitchen table with defendant and one agent stood in the

doorway between the kitchen and the dining (room). Id. at 174-175, 181. The agents were armed but their guns were not drawn. Id. at 179. The officers did not threaten the defendant. Id. The agents did not advise the defendant of his Miranda rights. Id. at 175. During the conversation, the defendant admitted to possessing child pornography. Id.

After being charged, the defendant moved to suppress his statements. The district court denied the motion. On appeal, the Fourth Circuit held that based on the totality of the circumstances, the defendant was not subject to a custodial interrogation, and therefore, no Miranda warnings were required. Id. at 179.

In the instant case, after examining the totality of the circumstances, the Court finds that a reasonable person in Defendant's position would have felt free to leave the interview at any time and was not in custody. The interview of Defendant was in a vehicle just outside of and in the driveway of her home. Defendant was not asked by law enforcement officers to talk with the officers, but she was, in fact, asked by her son, Michael Smith, if she would speak to the officers. Michael Smith had spoken to the officers, and he had just left the interview with the officers without being placed into custody. Defendant was told by the officers at the beginning of the interview she was not under arrest. When told by the officers about the topic of the interview, Defendant stated, "I have no problem." When the interview was completed Defendant requested a card from the officers so that she could call them if she thought of something. Finally, Defendant was not arrested, and she left the van and was in fact free to go.

As a result of the foregoing, the undersigned finds that Defendant was not in custody during the interview with the officers and therefore was not entitled to Miranda warnings.

The Court concludes that Defendant's Motion to Suppress, based upon a custodial interrogation, should be denied.

**(2)**  Defendant's statement was voluntarily given.  In <u>United States v. Braxton</u>, 112 F.3d 777, 780-81 (4th Cir. 1997), the Fourth Circuit explained that:

> The admissibility of Braxton's statement turns on whether the statement was voluntary under the Fifth Amendment which guarantees that no person…shall be compelled in any criminal case to be a witness against himself…without due process of law.  U.S. Const. Amend. V; accord <u>Malloy v. Hogan</u>, 278 U.S. 1, 7, 84 S. Ct. 1489, 1493, 12 L.Ed.2d 653 (1964) (holding that when "a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself'" (quoting <u>Bram v. United States</u>, 168 U.S. 52, 542, 18 S. Ct. 183, 186, 42 L.Ed. 568 (1897)).  A statement is involuntary under the Fifth Amendment only if it is "involuntary" within the meaning of the Due Process Clause.  <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 304, 105 S. Ct. 1285, 1290, 84 L.Ed.2d 222 (1985) (<u>citing</u> <u>Haynes v. Washington</u>, 373 U.S. 503, 83 S. Ct. 1336, 10 L.Ed.2d 513 (1963); <u>Chambers v. Florida</u>, 309 U.S. 227, 60 S. Ct. 472, 84 L.Ed. 716 (1940)).  The test for determining whether a statement is voluntary under the Due Process Clause "is whether the confession was 'extracted by any sort of threats or violence, [or] obtained by direct or implied promises, however slight, [or] by the exertion of any improper influence.'" <u>Hutto v. Ross</u>, 429 U.S. 28, 30, 97 S. Ct. 202, 203, 50 L.Ed.2d 194 (1976) (alterations in original) (<u>quoting Bram</u>, 168 U.S. at 542-43, 18 S. Ct. at 186-87). In <u>Colorado v. Connelly</u>, 479 U.S. 157, 107 S. Ct. 515, 93 L.Ed.2d 473 (1986), the Supreme Court held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." <u>Id</u>. at 167, 107 S. Ct. 15 521.

> The mere existence of threats, violence, implied promises, improper influence, or other coercive policy activity, however, does not automatically render a confession involuntary.  The proper inquiry "is whether the defendant's will has been 'overborne' or his 'capacity for self-determination critically impaired.'"  <u>United States v. Pelton</u>, 835 F.2d 1067, 1071 (4th Cir. 1987) (<u>quoting Schneckloth v. Bustamonte</u>, 412 U.S. 218, 225, 93 S. Ct. 2041, 2046, 36 L.Ed.2d 854 (1973)).  Any statement given freely and voluntarily without any compelling influences is admissible in evidence.  See <u>Miranda v. Arizona</u>, 384 U.S. 436, 478, 86 S. Ct. 1602, 1629, 16 L.Ed.2d 694 (1966).  The government bears the burden of proving by a preponderance of the evidence

that the statement was voluntary.  See Lego v. Twomey, 404 U.S. 477.

> To determine whether a defendant's will have been overborne or his capacity for self-determination critically impaired, courts must consider "the 'totality of the circumstances', including the characteristics of the defendant, the setting of the interview, and the details of the interrogation."  Pelton, 835 F.2d at 1071 (quoting United States v. Wertz, 625 F.2d 1128, 1134 (4th Cir. 1980)); accord Ferguson v. Boyd, 566 F.2d 873, 877 (4th Cir. 1977) (per curiam).

Some of the factors to consider in determining the totality of the circumstances "include the defendant's age, education, level of intelligence, the setting of the interview, the details of the interrogation, the duration of questioning, the use of physical coercion or deprivation, the defendant's experience with the criminal justice system, and whether the defendant has been advised of his Miranda rights."  United States v. Leonard, 141 F.3d 1161, 1998 WL 163735, at *4 (4th Cir. 1998) (unpublished).

The totality of the circumstances in this case demonstrate that Defendant's will was not overborne and her capacity for self-determination was not critically impaired, and the statements made by Defendant were given freely and voluntarily without compelling influence.  No threats were made to Defendant, and she was told she was not under arrest. (Apr. 24, 2018 Hr'g Tr. at 69-70.)  Defendant was not handcuffed, and she was not arrested. (Apr. 24, 2018 Hr'g Tr. at 71.)  Defendant was requested by her son, Michael Smith, to walk out of the house to the van for the interview. (Apr. 24, 2018 Hr'g Tr. at 92.)  Defendant told Officer McIntyre she was disabled when speaking about her disability payments being used to purchase the rifle, but Officer McIntyre did not ask Defendant about her disability. (Apr. 24, 2018 Hr'g Tr. at 93, 96)  Officer McIntyre did not notice anything about Defendant that would have caused him to think she had a disability. (Apr. 24, 2018 Hr'g

Tr. at 96.) The recording of the interview, Gov.'s Ex. 1, shows the officers told Defendant that she was not being truthful, but this technique did not render a confession being made during the interview involuntarily. See United States v. Dehghani, 550 F.3d 716, 720 (8th Cir. 2008).

The undersigned has listened carefully to the recording on multiple occasions and concludes that the interview was extremely cordial. The interview depicts the following: Defendant as being at least of average intelligence; the questioning of Defendant was polite and short in duration; and Defendant's statements were freely provided. Therefore, the Government has proven by a preponderance of the evidence that Defendant's statement to Officer McIntyre was voluntary.

**C.    Michael Smith's Statement**

Defendant seeks to suppress the statement made by Michael Smith to the officers. See Gov.'s Ex. 2. Defendant does not cite any authority in her brief for the suppression of the statement of her son, Michael Smith.

"Fifth Amendment rights . . . a person may not be vicariously asserted." United States v. Hensel, 509 F. Supp. 1376, 1385 (D. Maine 1981) (citing Couch v. United States, 409 U.S. 322, 328-29 (1973)). Defendant does not have standing to suppress the statements of Michael Smith. Therefore, Defendant's Motion to Suppress her son's statements must be denied.

## RECOMMENDATION

**IT IS THEREFORE RESPECTFULLY RECOMMENDED** that Defendant's Motion to Suppress (# 23) be **DENIED**.

Signed: July 5, 2018

Dennis L. Howell
United States Magistrate Judge

**TIME FOR OBJECTIONS**

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C) and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law and recommendation contained herein must be filed within fourteen (14) days of service of the objections. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from

28

raising such objections on appeal.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985), <u>reh'g denied</u>, 474

U.S. 1111 (1986); <u>United States</u> <u>v. Schronce</u>, 727 F.2d 91 (4th Cir.), <u>cert. denied</u>, 467 U.S.

1208 (1984).